ELIZABETH CLAGETT, *et al. vs.* CHARLES SALMON.
*December,* 1833.

C died, and an inventory of his estate was returned by his administratrix to the Orphans Court, in 1816, who passed an account termed a final account in 1823.   In 1827, the administratrix and several of the children of the intestate united in a mortgage of property mentioned in the inventory— HELD, that the rights of creditors of the deceased not being in controversy, the mortgagors could not contend that this property was in the hands of the administratrix for distribution, and from the lapse of time, a court of equity would presume, in support of the mortgage, that the intestate's debts had been paid, and distribution made.

The act of 1763, *ch.* 13, relates wholly to gifts of negroes and slaves, and has nothing to do with mortgages, or other assurances for valuable consideration.

By the act of 1729, *ch.* 8, a mortgage of personal property, of which the mortgagor retains possession, is void, so far as the rights of creditors are concerned, unless acknowledged and recorded as therein prescribed, but although not recorded at all, or not recorded in time, it is still legally effectual against the mortgagor and all claiming under him.

Several persons united in a mortgage of the property, reciting that C, one of the parties, had lately commenced, and intended pursuing the business of a merchant, and that the mortgagee had agreed to give him credit and become his surety and endorser to the amount of $10,000 in the prosecution of his business, and the mortgage also contained a proviso to indemnify the mortgagee from all advances, &c. which he shall "incur or make on account of the said C, not to exceed at any one time the sum of $10,000." HELD, that the sureties of C were not discharged because the mortgagee did not limit his advances to the sum of $10,000, and that the object of that stipulation was merely to confine their responsibility within that sum, and not to prevent the mortgagee giving C further credit.

A mortgagee, before the period at which he has a right to foreclose or sell, the subject mortgaged, upon a bill charging that the mortgagors contemplate and design to sell and dispose of the mortgaged property, with a view of defeating his lien, or that he is apprehensive the defendants will sell, dispose of, conceal, or remove the whole of the personal property before the same could be made responsible to him for the satisfaction of his claim, may obtain an injunction to preserve the property, and prevent it from being removed before it could be made responsible for his claim according to the terms of the mortgage, and the Chancellor may pass a final decree upon such a bill in conformity with the principles, and for the objects, above mentioned.

Where a complainant applies to a Court of Chancery for an injunction to preserve property mortgaged to him, from waste, destruction or removal, which he has sufficient reason to apprehend will occur before he has a

right to proceed upon his mortgage for a sale or foreclosure, he is entitled to costs, upon the final decision of his cause.

At law, if two persons be bound jointly and severally, and the obligee releases one of them, both are discharged, yet equity will not give a release or operation beyond the intention of the parties, and the justice of the case.

Where time is given by contract to a principal for the payment of a debt, without the consent of a surety, he will be discharged because he is only bound by the terms of his contract, and any variation of those terms, without his consent, will operate to discharge him.

A creditor may stipulate with his debtor, giving him time for the payment of his debts, and in the same contract declare, that such forbearance shall not affect the creditor's rights against the debtor's sureties. By the reservation of the remedy against the sureties in the contract for time, the debtor tacitly consents to forego and waive the benefit of such contract, in case the creditor should afterwards find it necessary to resort to the sureties for the full and complete extinguishment of his debt.

Such a contract between the creditor and principal debtor is not absolute, but conditional and contingent; and in effect, the debtor being at all times responsible to his sureties in case they are proceeded against by the creditor, they cannot claim to be discharged from liability to such creditor.

APPEAL from the Court of Chancery.

A statement of this case was given by the Judge who delivered the opinion of this court, as follows, viz:

The bill states that *Thomas Clagett*, one of the defendants, having a short time previous to the 22d of September, 1827, engaged in business in the city of *Baltimore*, as a merchant, the complainant agreed and undertook to give credit to, and to become surety and endorser on notes drawn by said *Clagett*, in the prosecution of his said business to the amount of $10,000; and the said *Thomas Clagett*, and his mother, and several of his brothers, with a view to indemnify and save him harmless, executed in due form of law, a deed of mortgage, bearing date on the 22d of September, in the year aforesaid, whereby they conveyed to him all their right and title, in and to a tract of land therein mentioned; and also, all their right, title and interest, in and to the personal estate of which *William Clagett* died possessed, consisting of negroes and other personal property, then, and still in the possesion of two of the mortgagors. The bill further charges, that in pursuance of said

agreement, he did give credit to said *Thomas Clagett* for goods sold, and money loaned, and did endorse notes drawn by him, to the amount of $16,488 34. That *William Clagett* died possessed of a large personal estate; that *Elizabeth Clagett* administered thereon, made a final settlement of said estate, and held in her hands, subject to distribution, a considerable amount of property, which had not been paid to the different representatives, although distribution had been made by the authority of the Orphans Court; but that she and *Edmund Clagett,* one of the defendants, had always been in possession of said property, using and employing the same, for the common benefit of themselves and the other representatives of the said *William Clagett.* The complainant states that he does not know the personal property embraced by the deed of mortgage, as there was no schedule or specification thereof ever made, and that he has reason to believe, and therefore charges that the defendants contemplate and design to sell and dispose of part or the whole of said property, with a view of defeating his lien on the same. That a decree for the sale of said property, according to the terms of the mortgage, cannot be had until after the 1st of October, 1830, and that he is apprehensive the defendants will, before that period, sell, dispose of, conceal or remove the whole or a part of said personal property, and thus jeopard a part of his claim against said *Thomas Clagett.* The bill further charges that certain goods, wares and merchandize, and debts, had been transferred by *Thomas Clagett,* and certain persons acting as his trustees to complainant, the proceeds of which property he was to apply to the payment of the debts of said *Clagett* due to divers individuals, and his own claim so far as it would go towards the same, and states that said property will be wholly inadequate for such purpose, and that a very large balance will be still due to him. The bill then prays for a discovery of the personal property intended to be conveyed by the mortgage, and an injunction prohibiting and restraining the defendants "from selling, disposing of, con-

cealing or removing the whole, or any part of the said personal property," until he could, according to the provisions of the said deed of mortgage, pray for a foreclosure and sale of the property included therein. The deed of mortgage referred to in the bill contains the following recital: "Whereas, the said *Thomas Clagett*, one of the parties of the first part of this deed, hath lately commenced, and intends pursuing the business of a merchant in the city of *Baltimore;* and whereas, the said *Charles Salmon* hath agreed to give credit to, and to become surety and endorser on notes drawn by the said *Thomas Clagett*, in the prosecution of his said business, to the amount of $10,000 current money, and the said *Elizabeth Clagett, Edmund Clagett, Samuel A. Clagett, Richard H. Clagett, John W. Clagett,* and *Thomas Clagett*, to indemnify and save harmless the said *Charles Salmon* for any advances he may hereafter make, or may have heretofore made for, or to the said *Thomas Clagett;* and also, for any endorsements which the said *Charles Salmon* may have heretofore, or shall hereafter execute for, or on account of the said *Thomas Clagett*, have agreed to execute and deliver these presents." The deed of mortgage then conveys all the right, title, interest and estate of the mortgagors, in and to some real estate therein mentioned, and also, all the personal estate of which the said *William Clagett* died possessed, consisting of certain negroes, horses and cattle, then in the possession of *Elizabeth Clagett* and *Edmund Clagett*, with a proviso, that if the said *Thomas Clagett* "shall well and truly pay, re-pay, and satisfy the said *Charles Salmon* for all advances of goods, or loans of money which the said *Charles Salmon* may have heretofore made, or shall, before the first of October, 1830, make to the said *Thomas Clagett;* and shall also indemnify and save harmless the said *Charles Salmon*, and against all endorsements which the said *Charles Salmon* may execute before the first day of October, in the year 1830 ; and shall also indemnify the said *Charles Salmon*, from and against all bills, bonds or notes which he shall sign or seal, as security for the said

*Thomas Clagett,* before the first day of October, 1830, the said advances, loans, endorsements and other liabilities, which the said *Charles Salmon* shall incur or make, on account of the said *Thomas Clagett,* not to exceed at any one time the sum of $10,000 current money, then and from thenceforth these presents, and every matter and thing herein contained, to the contrary in any wise notwithstanding." On the 19th of May, 1828, *Thomas Clagett* finding himself in failing circumstances, and unable to sustain his credit, conveyed all and singular his stock of goods, wares and merchandize, effects and property of every description belonging to him, as therein specified, and all debts, sums of money and claims due, or owing, and payable or belonging to him, to *Henry Beadle* and *Daniel Cobb,* in trust, for the benefit of the creditors of the said *Thomas Clagett,* and on the 26th of May, 1828, the said trustees, *Thomas Clagett* and the appellee, entered into the following agreement:

"We, the undersigned, acting as the representatives of the creditors of *Thomas Clagett* of the one part, and *Charles Salmon* of the other part, have agreed and do hereby agree to the following arrangement, and bind our respective principals to comply with and fulfil the same, viz: 1. A correct inventory of the goods shall be taken by two persons appointed by each party, at the cost, or such prices as the same have been invoiced at by the said *Thomas Clagett,* provided they have not been set down at more than the actual cost of the same. 2. The books, notes, and all other evidences of debt, shall be forthwith put into the hands of *Charles Salmon,* who shall use all due diligence in the collection of the same. All the personal and real property of the said *Thomas Clagett,* (excepting clothing and watch) shall in like manner, and in good faith be put in the hands of the said *Charles Salmon,* and valued by disinterested persons, and received by said *Salmon* at such valuation. 3. The said *Salmon* shall receive the goods when invoiced as above, at the gross amount of the same, together with all the moneys received on account of debts, notes, book ac-

counts, and place the same to the credit of the estate. 4. The said *Salmon* shall be responsible for the legal debts of said *Clagett*, to the amount of $39,500, including his own claim and borrowed money, and retain a mortgage which he now holds, to indemnify him, for any deficiencies which may exist after collecting the debts, and taking the goods at their invoiced prices, if any deficiency should then appear. 5. One gentleman shall be appointed by each party to examine every debt, and determine whether it shall be classed as borrowed money, or other legal debts, and should they disagree they shall have power to appoint an umpire, whose decision shall be binding. 6. The said *Salmon* shall give his notes severally to the creditors, at nine months without interest, or fifteen months, with interest added after nine months, at his discretion, for such portion as they shall decide to be legal debts, and his notes at ninety days, with interest, for such portion as they shall class as borrowed money. 7. Should the effects of *Thomas Clagett* not realize the aforesaid sum of $39,500, the said *Salmon* shall not foreclose the mortgage he now holds, until after the expiration of two years from this date. 8. After this agreement has been executed by the respective parties to it, it is understood that responsibilities to and from *Thomas Clagett* shall be annulled so far as the persons we severally represent, may be concerned ; also to exonerate the family of *Thomas Clagett* from the payment of such notes as may be signed or endorsed by them, and held by said *Salmon*, not interfering with, or invalidating their liability in the mortgage held by said *Salmon*. It is expressly understood that nothing contained in this agreement shall in any manner affect the mortgage heretofore given by *Thomas Clagett* and his family, to indemnify said *Salmon* against certain risks and losses, excepting so far as to delay foreclosing said mortgage for two years from the date hereof."

In execution of this agreement, the appellee obtained possession of goods and effects of considerable value, according to the proof in the cause.

Clagett, *et al. vs.* Salmon.—1833.

The answers deny that the deed of mortgage conveyed any right or title to any part of the personal estate. They insist that *Richard H. Clagett* was under age at the date of the deed, and that the agreement between the trustees, *Thomas Clagett* and *Charles Salmon,* released the mortgagors from any liability to the complainant, and that there are other representatives of *William Clagett,* whose rights are impaired by the injunction. A general replication was entered, and commission issued. The cause was set down for hearing, and the Chancellor decreed "that the said defendants be, and they are hereby restrained and enjoined, as prayed by the said bill of complaint, from selling, concealing or removing beyond the jurisdiction of this court, the negroes, &c. in the mortgage mentioned, or any other of the said mortgaged property in the possession of the said defendants, or any of them, at the time the said injunction heretofore granted, was served on them, until the further order of this court on any bill which may be filed by the said plaintiff to foreclose the said mortgage, or any bill that may be filed by the said defendants to redeem the said property. And as to the said *Richard H. Clagett,* the injunction was thereby dissolved, and the bill, as to him, dismissed with costs. And it was further decreed, that the defendants, other than the said *Richard H. Clagett* pay all the costs of this suit, not heretofore ordered to be paid by the plaintiff."

Bland, Chancellor, (December term, 1830,) delivered the following opinion :

The proofs substantially sustain the allegations of the bill, and leaving none of the facts of doubtful credibility, there is nothing to be determined but the principles of equity, properly arising out of those established facts. The defendants contend that the mortgage is void upon its face, to the extent of the personalty at least, as having been made by one who is incompetent so to dispose of it; and it is also a nullity against one of the grantors, who was an infant

when he signed it; and against all of them, because it has not the requisite solemnity of such a contract, that of having been recorded in time; and further, that there is an implied contract attendant upon this mortgage, which imposes obligations upon *Salmon* in favor of the sureties of *Thomas Clagett*, which *Salmon* has in various ways so disregarded as to have released those sureties from the incumbrance of the mortgage. In answer to which it is denied that any act of *Salmon's*, as here shown, can be considered as having that operation; and moreover, it is urged that all the obligations of the implied contract have been carefully and effectually preserved for the benefit of these sureties, so that they can have no ground to complain of any of *Salmon's* acts, whatever they may have been. Then passing from the subject of the suit to the suit itself, it is objected, that the plaintiff can have no relief in this case, because the suit has been instituted too soon; and because to perpetuate the injunction merely, would be to lay the defendants subject to the caprice of the plaintiff, without leaving them any means of extricating themselves. These are the matters to be considered.

In taking the position that the mortgage is absolutely void, because the grantor as administratrix had no power to make such a deed, I understood the defendants as making no such objection to it, as a conveyance of the realty therein mentioned ; and as also assuming the ground, that unless it can avail the plaintiff as a deed proceeding from the administratrix, who alone, among the grantors, had power thus to sell or pledge the personalty, it must fail as to that altogether. I shall, therefore, as regards this position, consider this deed as embracing nothing more than the property therein specified, as the assets which *Elizabeth Clagett* held as administratrix of the late *William Clagett*. An executor or administrator is in equity regarded as a trustee, but then in equity as well as at law, an administrator is considered in general, as the absolute owner of the assets of the deceased, whether they be legal or equitable, or *choses in*

*action.* The exercise of the powers of unqualified owner-
ship, to a certain extent, is indispensably necessary to en-
able him to execute his trust, and to discharge his duty to
advantage; and also to prevent the general inconvenience
of implicating and entangling third persons in inquiries, as
to the application he may propose to make of the money
produced by the conversion of the assets. A fair purcha-
ser for a valuable consideration, is in no way bound to see
to the application of the purchase money by an executor.
He can have no means of knowing the debts of the de-
ceased, and is therefore absolved from all inquiry respect-
ing them. Upon those general principles, not even a cred-
itor of the deceased is permitted to follow the assets so
aliened; for the demand of a creditor is only a personal de-
mand against the executor, in respect of the assets come to
his hands, but no lien on the assets; and a specific or resi-
duary legatee can stand upon no higher ground in this re-
spect than a creditor. 1 *Atk.* 463.   14 *Ves.* 359.   17 *Ves.*
154.   4 *Mad.* 357.   The only qualification of this general
rule is, where the transaction is in some way tainted by
fraud.   Every person who acquires personal assets by a
breach of trust, or *devastavit* in the executor or administra-
tor, is responsible to those entitled under the will, or as
creditors, or next of kin, if he be a party to the breach of
trust.   What will amount to a fraud of this kind, must de-
pend upon the circumstances of the case.   It is said that,
generally speaking, he does not become a party to the
breach of trust by buying, or receiving as a pledge for mo-
ney advanced to the executor at the time, any part of the
personal assets, whether specifically given by the will or
otherwise, because this sale or pledge is held to be *prima
facie* consistent with the duty of an executor.   Generally
speaking, he does become a party to the breach of trust, by
buying or receiving in pledge any part of the personal as-
sets, not for money advanced at the time, but in satisfaction
of his private debt, because this sale or pledge is *prima fa-
cie* inconsistent with the duty of an executor. 4 *Mad.* 357.

In this case, the administratrix has not sold or pledged the assets of her intestate, for money advanced to her by *Salmon*; but she has mortgaged them to indemnify *Salmon* for any loss he may sustain, in the manner described, from *Thomas Clagett*. *Salmon* has advanced no money to this administratrix, which she might or might not have applied to the uses, and for the benefit of the estate of her intestate. On the contrary, this mortgage is, on the part of the administratrix, a voluntary pledge of the assets of her intestate, to insure the payment of the debt of another. It *is upon the face of it, and in terms,* an application of the assets, in a manner wholly inconsistent with her duty as administratrix, and *Salmon*, as the grantee, is a party to this breach of trust. This mortgage must, therefore, be considered as at least *prima facie* in equity, as a fraudulent application of the assets, as against all those who have a claim upon them as creditors, or next of kin of the intestate.

But there is here no creditor, nor any one of the next of kin of the deceased, who makes any objection to this mortgage, or asks to have it set aside on the ground of fraud to let in his claim. There is no such person now here attempting to follow these assets for any such purpose—and if there be any one who has an interest in the personal property so pledged, independently of, and superior to those bound by, or who claim under this deed, they are not now before this court; and it is very clear, that none of these defendants can be suffered to impugn their own deed for the benefit of others, not parties to this suit. But administration was granted to this defendant, *Elizabeth*, so long ago as the year 1816, and she executed this mortgage on the 22d September, 1827, then having this property in her possession. It is not intimated that there are any outstanding debts due from the intestate; and if these, his children, who are here as defendants, had any claim as distributees, they have made none, and therefore must be presumed to have been satisfied. But supposing they had not received any satisfaction for their respective distributive shares, they

have, by this their own deed, completely bound up and mortgaged the whole of their interest, whatever it may be, to its utmost extent.   17 *Ves.* 170.

*Richard H. Clagett,* by his answer, relies on the fact of his having been an infant at the time he signed the mortgage, as an ample defence for himself.   The fact of his infancy is fully established by the proof.   He, however, asks for himself no more than to be discharged from the obligatory force of the deed, and to have it treated as a nullity so far as it is made the foundation of any claim against him. But he makes no claim of his distributive share of the intestate's estate in any form.   He does not allege that he has not been satisfied by this administratrix to the full amount of his distributive share.   So far from making any such assertion, of his own individual rights in opposition to this deed, he plants his defence against it, apart from the allegation of his infancy, in all respects upon the same ground taken by all the other defendants; and consequently, although he cannot, because of his infancy, be bound by the mortgage as his deed, yet, having by his own answer failed to assert his right when thus implicated and called on to do so, he must be considered as having waived all objection to this mortgage, on the ground of its having made any improper disposition of his interest, inconsistent with the office and duty of the administratrix.   Hence, as *Richard H. Clagett* for this reason, can on the one hand, claim no protection of his interests in this suit, so on the other, because of his infancy there can be no decree against him.   I shall therefore dismiss the bill as to him.

It has been urged, however, that although this administratrix might have had sufficient power so to dispose of the assets, or that the questionable disposition thus made of them had been fully affirmed by the distributees; yet that the instrument by which it was proposed to be effected, not having been recorded, is in that respect deficient in one of those solemnities necessary to constitute a valid mortgage.   By the common law, to make a valid deed, certain forms and

ceremonies are indispensably necessary in that way to man-
ifest the deliberate will of the contracting parties; and it is
admitted that this mortgage has all the common law requi-
sites of a binding deed. But the legislative enactments of
*Maryland*, which require deeds to be recorded, like those
of *England*, requiring enrollment, are universally admitted
to have been intended to preserve the evidence of the con-
tract, and to prevent the practice of fraud upon creditors
and purchasers. The object was to furnish the means of
notice, and a protection to innocent third persons, not par-
ties to the contract. It never has been held, that those laws
altered any principle of the common law, or required any
thing in addition to the common law solemnities, as a ne-
cessary constituent of a deed, to secure the payment of mo-
neys, as between the parties to it. Hence, a deed of this
kind, as between the parties themselves, has always been
deemed as valid and effectual, without recording, as with it.
And as to creditors and purchasers, if they have by any
other means obtained that notice, which it was the design
of recording to give, even they are not allowed to object to
the validity and operation of the deed on that account.
But in no instance has any of the immediate parties to such
a deed ever been suffered to object, that it should not be en-
forced, because it had not been recorded in time; such an ob-
jection can only come from a creditor, a purchaser, or some
innocent third person, whose interests are affected by the
deed. Here there is no such third person before the court;
the objection is made by some of the parties to the mortgage
itself, which cannot be permitted; since as to them, the deed is
valid by the common law, and in no way affected, as a se-
curity for money, by the acts of assembly requiring such
instrument to be recorded. There is then nothing in this
position taken against the validity of the mortgage. 2 *Inst.*
674. 1 *Lord Raymond*, 388. 1 *Salk.* 199. 1 *Cran.* 240.
6 *Harr. and Johns.* 63.

It appears that *Charles Salmon* had agreed to lend his
credit to *Thomas Clagett*, by selling him goods, to be paid

for at some future day, by lending him money, and by be-coming his surety in the way of lending or endorsing notes. Hence, in respect to that agreement, they stand towards each other simply, as creditor and debtor.  But for the purpose of securing *Salmon* against any loss he might sus-tain by the credit so given, *Thomas Clagett* with *Elizabeth Clagett* and others, mortgaged their property to *Salmon;* and consequently, to the extent of *Salmon's* claim for in-demnity under the mortgage, he must be regarded as the creditor ; *Thomas Clagett*, as the principal debtor, and *Eli-zabeth Clagett*, with the other mortgagors, as his sureties. This is the situation in which the parties have been placed by the mortgage itself; and this suit brings them here in the same relation towards each other.  The dealings be-tween *Salmon* and *Thomas Clagett* are no otherwise of any importance in this case, than as showing the consideration on which *Salmon's* claim is founded, and that it is of some amount; or how far any of *Salmon's* conduct, in relation to those dealings, may have impaired that implied contract, in virtue of which the sureties of *Thomas Clagett* have a right to have the impending loss averted from them, by a bill *quia timet;* or to take the place of *Salmon* in order to obtain re-imbursement.

It is universally admitted, wherever the relation of prin-cipal debtor and surety subsists, that if the surety pays the whole debt, he has a right to be put into the place of the creditor as to all his remedies for the recovery of the debt. This right of subrogation is recognized in courts of com-mon law, as founded upon an implied contract; and in chan-cery as resting upon such a contract, or as an equity pro-perly belonging to the case, or as based upon a principle of natural justice, which springs into existence *immediately* that the debt falls due, and the surety becomes liable to be called on for payment.  This implied contract binds the creditor, if required by bill in equity at the instance of the surety, to sue immediately for the recovery of his debt; or if the debt has been wholly paid by the surety, to

transfer to him all his securities, as well those which he held at the time the surety became bound, as those which he may have since acquired, even without the privity or knowledge of the surety, such as a judgment recovered against the principal, or a mortgage by way of collateral security. The surety, in such case has a right to an assignment of all the creditor's securities, to enable him to proceed immediately in the same manner, as the creditor might have done to obtain satisfaction or reimbursement. And therefore, if the creditor being competent to contract, has by express agreement enlarged the day of payment; or has by his acts increased the peril of the surety; or has parted with any of his securities; or has in any other manner altered or impaired the obligation of the implied contract, (which for the protection of the surety is always associated with the express contract as its inseparable incident,) then the surety is discharged; upon the ground that all such acts are against the faith of the implied contract, by virtue of which the surety had precisely the same right the creditor had, and must be allowed to take his place in all respects; and also upon the ground that the creditor is a trustee of his security; that is, the bond, judgment, execution, or the like for all parties interested in it, or who may ultimately resort to it for relief. 1 *Cha. Cas.* 70. 1 *Vern.* 190. 2 *Vern.* 608. 2 *Bro. C. C.* 579. 3 *Bro. C. C.* 1. 2 *Ves. Jr.* 540. 10 *Ves.* 420. 11 *Ves.* 22. 14 *Ves.* 164. 3 *Merv.* 272, 570. 2 *Swan.* 187. *Selw. N. P.* 86, *no.* 27. 1 *Bos. and Pul.* 652. 2 *Ib.* 61. 2 *Rand.* 529. *Gilm.* 149. 6 *Mun.* 6. 2 *De Saus.* 230, 389. 1 *McCord*, 116, 297. 5 *Harr. and Johns.* 242. 7 *Ib.* 35. 2 *Harr. and Gill*, 90. 3 *Wheat.* 520. 1 *Poth. Obl.* 406.

It is believed, that the obligation of private contracts has been regarded by all civilized people, as of the highest and most inviolable sanctity; and according to our fundamental law, there is no power in the land by which the obligation of such contracts can be in any manner lessened or impaired. Here, and as to this point, it is not pretended

that the mortgage itself has been, or can be in any way, stripped of a single atom of its own proper, legal or equitable obligatory force.   But those defendants who stand here as sureties, referring to that implied contract, the incident of the mortgage, to the full benefit to which they are entitled, urge that its obligation has been materially impaired to their prejudice; and therefore, that they are discharged. They allege, that its obligation has been altered, diminished or destroyed, by the circumstance of *Salmon* having increased their peril, by giving to *Thomas Clagett* credit for an amount greater than that specified in the deed; and by having by an express agreement with *Thomas Clagett*, after the debt became due, enlarged the time of payment, and also by his having released a security he had procured, by means of which he might, for aught that appears, have obtained a complete satisfaction of his debt.

On behalf of the sureties of *Thomas Clagett* it was contended, that their guaranty of indemnity was in all respects a limited one, by which they not only intended that they themselves should not be responsible beyond a specified amount; but that *Thomas Clagett* should not be credited for more than that amount by *Salmon;* because by so involving him beyond the specified sum, his situation would be rendered more precarious, and they would thereby be more likely to be damnified.   If that was the intention of these sureties, they certainly have not so distinctly expressed themselves by this mortgage.   That deed evidently purports to be a continuing guaranty, not merely until the sureties should think proper to put an end to it, by giving notice to *Salmon* that it should be no longer continued, but its duration forms an express part of the contract itself; it was to endure until the 1st of October, 1830, and no longer; and it was not to exceed in amount the sum of $10,000; thus limiting the extent of the liability of the sureties, without making the slightest allusion to the extent of the credit which *Thomas Clagett* might obtain from *Salmon*, or any one else; or  to the scope of his business; or

to the perils and risks in which he might be involved by the wide range of his commercial concerns. The sense, and substance of this mortgage, considered as a guaranty, comes to this, that these sureties thereby undertook to sustain the credit of *Thomas Clagett*, to an amount not exceeding $10,000, continually, from that time until the first of October, 1830. It is therefore of no importance, as regards this mortgage, what may be the amount of the debt due from *Thomas Clagett* to *Salmon* beyond that sum; since the mortgage covers no more than $10,000; nor is it of any consequence when, within the specified period of time, the credit was given by *Salmon* to *Thomas Clagett*, so it was given in the manner prescribed in the deed. The proofs clearly establish the fact, that the liability from *Thomas Clagett* to *Salmon*, was incurred in the mode specified by the deed; and therefore, I am opinion, there is no foundation for this objection. 3 *Wheat.* 148. 12 *East.* 227.

It has also been insisted that the credit has been extended, and the time of payment enlarged by the agreement of the 26th May, 1828. Whether that can be so considered must depend upon what shall be deemed the true meaning of the mortgage. I take the sense of that contract to be, that *Salmon*, upon the faith of the property so pledged to him, agreed to lend his credit to *Thomas Clagett* during a certain time, and to a specified amount. The sole object of that deed was to obtain for *Thomas Clagett* such a credit; but if the mortgage might have been foreclosed at any time, to enforce payment for any parcel of goods sold, and of every sum of money lent by *Salmon* to *Thomas Clagett*, as it became due, the very object of the deed might have been defeated. He would not have obtained such a credit as could have been used by him, as a capital, with which, to prosecute his business. The mortgaged property might have been sold, or the sureties forced at once to pay, when by postponing the payment, under the assurance of the guaranty, until the first of October, 1830, *Thomas Clagett's* business, even if it should fail, might be so wound

up as to produce no embarrassment, nor result in loss to any one.   The limitation of the amount of the credit to $10,000, also shews it to have been the true meaning of the parties, that *Salmon,* on his part, undertook, and agreed to give credit to *Thomas Clagett,* to that amount, in the manner described, until the first of October, 1830.

Much stress has been laid on the fact, that the notes given by *Thomas Clagett,* and some others of the grantors fell due long before the first of October, 1830; and that *Salmon* being then liable to pay, he must then be considered as entitled to indemnity, by a foreclosure of the mortgage. 4 *Desau.* 45.   But that very circumstance shows, that it could not have been their intention to subject themselves to a foreclosure of their mortgage immediately, that those notes fell due ; because the express object in so pledging their property was to sustain *Thomas Clagett's* credit, to a period far beyond that time.   I am, therefore, of opinion, that the mortgage could not have been foreclosed before the first of October, 1830, and consequently, the stipulation in the agreement, that it should not be foreclosed until two years after the 26th of May, 1828, cannot be considered as an enlargement of the time of payment, to the prejudice of these sureties, who could not be called on for payment before the mortgage credit had expired.

The defendants have further insisted, that the deed of the 17th May, 1828, by which *Thomas Clagett* made an assignment of his goods for the benefit of his creditors, gave to *Salmon* security for the payment of the debt covered by the mortgage, which he was bound to make available to its full extent; or to hold it for the benefit of the sureties of *Thomas Clagett.*   But that deed could not in any way be considered as a security held by *Salmon.*   His debtor *Thomas Clagett,* placed certain funds by its means in the hands of trustees for the benefit of his creditors generally, which might have been so applied or not; but nothing was thereby put in the hands of *Salmon,* or placed exclusively within his power or control.   The agreement of the 26th of the

same month, it is true, did give *Salmon* an additional secu-
rity for his debt; but he alleges, and it is in proof, that he
still holds that security, and he has used all due diligence
to make it as productive as possible. There is, therefore,
no foundation for this objection, upon which these securities
claim to be discharged.

By the agreement of the 26th May, 1828, it is stipulated
that after it had been executed by the respective parties,
that all responsibilities to and from *Thomas Clagett* shall be
annulled, so far as the persons represented by those who
signed it, might be concerned. The responsibilities to and
from *Thomas Clagett* here referred to, were the notes of
*Thomas Clagett,* and his contracts for the payment of mo-
ney held by *Salmon,* and his other creditors. It is, how-
ever, only those responsibilities or securities, held by *Sal-
mon* alone, and which he annulled, that can in any way be
considered as prejudicial to these sureties. The whole in-
strument of the 26th May, 1828, must be taken together,
and so taken, it appears that *Salmon* himself dicharged
*Thomas Clagett* from no responsibility whatever; because
it is expressly stipulated that *Salmon* shall retain the mort-
gage to indemnify him for any deficiency which might exist,
after the application of the funds then put into his hands; in
other words, that after so obtaining a partial payment, *Tho-
mas Clagett* should be held bound as his debtor for the ba-
lance. So far then, there is nothing like a discharge of any
security held by *Salmon.* But *Salmon,* it is said, held the
notes of *Thomas Clagett,* and it is true he did; but they
were notes signed or endorsed by the family of *Thomas
Clagett,* who are these very mortgagors, and sureties; and
the family of *Thomas Clagett* were expressly exonerated
from them only.

Those notes were securities upon which they could not
sue, nor derive any benefit from; because they were their
own; and an assignment of them according to the requisi-
tions of the implied contract, would have amounted precise-
ly to that, which this agreement declared, a complete exon-

eration of their liability, and nothing more. It also appears that *Salmon* had lent his notes to *Thomas Clagett*, which *Salmon* had taken up at maturity; but these were responsibilities or securities, upon which *Thomas Clagett* could not have been sued upon an assignment in any form from *Salmon*. The securities which a surety has a right to have transferred to him, must be such as would have enabled the creditors to obtain satisfaction of his debts from funds, or from persons, other than the surety himself; but in this case, there were no such securities held by *Salmon*. It follows therefore, that this objection also of the defendants must fail.

But the plaintiff contended, that even if the mortgage might have been foreclosed, at any time after he became liable on his notes lent to *Thomas Clagett* ; or after *Thomas Clagett's* notes, or the money he lent him became due; and even if the agreement of the 26th May, 1828, should be considered as an express enlargement of the time of payment; yet, that these sureties cannot be discharged; because all the remedies have been reserved. It is laid down that a composition with, or giving time to the principal debtor, with a reservation of the creditor's remedies, will not discharge the surety. The giving of time to the principal debtor, with a reservation of the remedies, has in many cases the appearance of absurdity ; because, when distinctly understood, it seems to be almost a flat contradiction in terms. Such a reservation of remedies, in order to hold the surety bound, must amount to this, that the creditor agrees to give time to the debtor; and yet that they both agree, that the surety may at any time force the creditor to proceed against the principal by a bill *quia timet,* or by paying the whole debt, have an assignment of all the securities, and proceed immediately himself against the principal debtor ; or in any other mode authorised by the assigned securities. Such an agreement reserving the remedies, might not in many cases be of the least benefit to the principal debtor ; since it leaves him entirely at the mercy of the surety; yet if the parties

do so expressly contract, the surety can have no ground to complain, that the implied contract has been altered or impaired in any way to his prejudice; and therefore he cannot be discharged. 6 *Ves.* 807. 18 *Ves.* 20. 3 *Bos. and Pul.* 363. 8 *East.* 576. 1 *Peters,* 575.

By the agreement of the 26th May, 1828, it is expressly declared, that nothing herein contained should in any manner affect the mortgage given by *Thomas Clagett* and his family, to indemnify *Salmon* against certain risks and losses. If this general reservation had been made in an agreement betwen *Salmon* and the other creditors of *Thomas Clagett* alone, there might have been some difficulty in treating it as such a reservation as would preserve to the sureties the benefit of the implied contract in all respects; because it is not enough that the creditor alone should make such a stipulation, the principal debtor must also consent, that his liability to the surety should remain entire and undiminished. But here, *Thomas Clagett,* by signing this agreement, has thereby distinctly assented to this express reservation of the remedies upon the mortgage itself, as well as upon its incident implied contract; for the stipulation, that nothing therein contained, should affect the mortgage, must, according to every fair interpretation of the expression, be considered as a complete reservation of the remedies to this whole extent. And so considered, it is clear, that these sureties cannot found any claim to be discharged from the mortgage, upon any thing contained in the agreement of the 26th May, 1828.

The defendants moreover object, that supposing they are wrong, as to the time when the mortgage might have been foreclosed, then the plaintiff cannot have under this bill relief of any kind, because he has instituted his suit before his debt became due; and, that if this injunction were to be made perpetual, they would be tied up indefinitely, and thrown at the mercy of the plaintiff, without the possibility of relieving themselves in any way whatever. Where a debt secured by a mortgage is made payable by

instalments, it is well settled that the mortgage becomes forfeited by the non-payment of the first instalment, and may be foreclosed immediately after that time. If a bill be filed for that purpose, the debtor may, however, prevent a foreclosure, or sale, by paying the instalment then due; but if he fails to do so, then the mortgage may be entirely foreclosed; or so much of the property may be sold, as will satisfy the sum due at that time; and the decree will be allowed to stand as a security for the other instalments as they become due. But if the mortgage property cannot be conveniently or safely sold in parcels, then it must be disposed of entire; and the whole debt raised and paid, with a rebate of interest on the sums not due, at the time of paying over the proceeds of sale to the creditor. This is done from necessity, and as an unavoidable consequence of the peculiar nature of the case. 2 *Vern.* 133. 2 *Eden.* 197. 3 *Mad.* 160. 2 *Mun.* 412. 1 *Maul. and Selw.* 706. 1 *Wils.* 80. 3 *Burr.* 1370. *Doug.* 100. 6 *Term. Rep.* 399. 1 *Bin.* 152. 3 *H. & McH.* 94. 6 *Harr. and Johns.* 476.

It is also well established, that if the mortgagor who holds the possession commits waste, or in any manner attempts to diminish the value of the property, or where it consists of personalty, is about to remove it beyond the reach of his creditor, so as to render it unequal to the discharge of the debt; or to place it so as not to be forth-coming for the satisfaction of the debt, he may be restrained by injunction. And an injunction for such a purpose may be obtained at any time before the debt becomes due; for otherwise, a fraudulent mortgager, might at his pleasure deprive the creditor of all benefit from his mortgage. Upon this ground this injunction was granted, and now reposes. *Eden. Inj.* 119.

It is clear, that this mortgage could not have been foreclosed at the time the bill was filed; because the credit given had not then expired; and therefore, *Salmon* could not then have asked for more than he had prayed for; that is, to have the property placed under the protection of an

injunction from this court; and relief cannot now be extend-
to him beyond that of perpetuating the injunction hereto-
fore granted. In a case situated like this, the plaintiff, be-
fore the debt became due, filed a bill praying for a sale and
an injunction to stay waste. The injunction was granted;
and on the coming in of the answer, was, on motion to dis-
solve, continued to the final hearing. After the mortgaged
debt became due the mortgagee filed another bill praying
a sale. Upon the hearing of which second bill it was ob-
jected in the answer, that there was another suit then de-
pending embracing the same subject. But I consider the
first as a mere injunction bill, on which there could have
been no decree for a sale, and as not at all inconsistent with
the second bill, on which I decreed a sale accordingly.
*Brewer vs. Murdoch, Ms. 2, October* 1826.

It was indispensably necessary in this case, that the plain-
tiff should etablish his title, as he has done, and also to
show that there was some debt unsatisfied; for if the mort-
gage had been found to be defective or inefficient in its ori-
gin, or had been nullified by the fraud, or any improper
act of the plaintiff; or had been fully satisfied, the plaintiff
could not have had any foundation on which to call for the
preservation and protection of the property, which had
never been, or had ceased to be thus legally pledged for his
benefit. The validity of the mortgage has been sustained;
and it is in proof, that there is still a large amount of debt
covered by it. These points having been investigated and
determined, as a necessary basis for the decree now called
for in relation to this injunction, must be considered as
closed, and finally concluded between these parties, and
those claiming under them, on any bill which may be here-
after filed, either to foreclose, or to redeem. But it would
be needless now to determine the exact amount of the
debt due; and therefore, I deem it unnecessary to say,
whether the sum received from *Penrice* by *Thomas Clag-
ett,* or the house rent, ought, or ought not to be considered
as parts of the mortgage debt, the amount of which it will

be most proper hereafter to determine upon another blli. 2 *Mun.* 412. 1 *Bin.* 152.

Neither of the parties to this suit can sustain any substantial injury from this injunction being made perpetual; because it will merely so guard the property pledged, as to give to the plaintiff the full benefit of it, when he shall find it necessary, or be prepared to come here, and ask to have it applied to the satisfaction of his claim; and it will leave the defendants free to redeem and disengage it from the lien by which it is now bound, at any time they may think proper to pay the debt. I shall therefore continue the injunction so as to cover all the personal property now ascertained to be embraced by the mortgage; subject to the further order of the court, on either a bill to foreclose, or to redeem.

A decree was passed accordingly, from which the defendants appealed to this court.

The cause was argued before BUCHANAN, Ch. J., and MARTIN, STEPHEN, ARCHER, and DORSEY, J.

*Alexander,* for the appellant, contended,

1. That the complainant has no equitable claim or right to any part of the personal property mentioned in the mortgage from the appellants to him; the said property being in the hands of the appellant, *Elizabeth,* as administratrix of *William Clagett,* deceased, and admitted to be liable to the demands of creditors, and next of kin. *Alexander vs. Riston,* 2 *Gill and Johns.* 96. 6 *Buc. Abr.* 683.

2. That by the terms of said mortgage, the appellee stipulated to limit his advances to the sum of $10,000; and by giving credit beyond that sum he released the other appellants, who were only sureties. *Chase vs. McDonald and Ridgely,* 7 *Harr. and Johns.* 161.

3. That those sureties are released by the agreement of May, 1828, between the appellee, and the trustees of *Thomas Clagett,* which was intended materially to vary the original contract for guarantee, and to impair, and destroy the remedies to which the sureties, in the absence

of the agreement, would have been entitled. That agreement deprived the sureties of the benefit of the deed of trust from *Thomas Clagett* to *Cobb & Bidell,* which was for the general benefit of creditors, including *Salmon. Hayes vs. Ward,* 4 *Johns. Ch. Rep.* 130. *Craythorn vs. Swinbourne,* 14 *Ves.* 162. 1 *Mad.* 185. *Capel vs. Butler,* 2 *Simons and Steuart,* 457. 3 *Stark. Ev.* 1050. 1 *Mad. Ch.* 405. *Rees vs. Berrington,* 2 *Ves. Jr.* 450. *Gould vs. Robson and Keymer,* 8 *East.* 576.

The agreement also extends the time of payment, as provided in the mortgage, and for that reason discharges the sureties. It has been said, that the mortgage was not forfeitable until 1830, and yet the sureties might have called on the creditor to sue the principal debtor as soon as any part of the money for which they were responsible became due and payable. *King vs. Baldwin,* 2 *Johns. Ch. R.* 562. *Barker vs. Wyld,* 1 *Vernon,* 140. But this agreement discharges the principal debtor, and consequently, the surety is discharged. *Coke Lit.* 232. (*a*) 4 *Bac. Abr. Release* (*G*) 282. *Rees vs. Berrington,* 2 *Ves. Jr.* 542. 2 *Chitty Eq. Dig.* 1175. *Shep. Touch.* 395. The reservation of the right to proceed upon the mortgage will not preserve the responsibilities of the sureties; they are discharged by the discharge of the principal. 1 *Poth.* 215. *Ex parte Gifford,* 6 *Ves. Jr.* 805. *Boultbee vs. Stubbs,* 18 *Ves.* 20. *King vs. Baldwin,* 2 *Johns. Ch. Rep.* 561. *Chitty on Bills,* 292. When the debt becomes due the surety may call on the creditor to sue the principal debtor, and the surety has a right to pay the debt, and to be substituted to all the rights and securities of the creditor, who cannot deprive him of these advantages, without forfeiting his remedy against him. *Wright vs. Simpson,* 6 *Ves.* 734. *Nisbet vs. Smith,* 2 *Bro. Ch. Cas.* 583. *Gould vs. Robson & Keymer,* 8 *East.* 576. *King vs. Sheriff Surrey,* 1 *Taunt.* 159.

There are some cases in which it has been held, that the right to sue the principal might be *suspended,* without discharging the surety; but none where the principal has been

released from the debt.   When that is done, the surety is-
absolved from all responsibility.   *Dean vs. Newhall*, 8 *Term.*
*Rep.* 168.   *Kirby vs. Taylor*, 6 *Johns. Ch. R.* 250.   And
the release of the principal, for a time, is equivalent to
a final discharge, in reference to its effect upon the surety.
*Coke Lit.* 274. (*a*)

4. That the appellee has failed to show by his bill, or
proofs, any ground for the interference of the court of Chan-
cery by injunction.   *Hanson vs. Gardiner*, 7 *Ves.* 309.
*Etches vs. Lance*, 7 *Ves.* 417.   *Hanway vs. McIntire*, 11
*Ves.* 54.   *Mattocks vs. Tremain*, 3 *Johns. Ch. Rep.* 75.
*Woodward vs. Schatzell*, 3 *Ib.* 412.   *Hippesley vs. Spencer,*
5 *Mad Rep.* 422.

5. That the court of Chancery erred in decreeing a per-
petual injunction, and in declaring such injunction to be
subject to any order to be passed in another cause.   *Nat.*
*Bre.* 140.   A final decree cannot be affected by an indepen-
dent bill filed by either of the parties.   There must be a
bill of review, or a bill in the nature of a bill of review.
*Bolton vs. Bull*, 3 *Ves.* 140.   *Hall vs. Hoddison*, 2 *P. Wms.*
162.

6. That the complainant was not entitled to his costs.
*Foulds vs. Midgley*, 1 *Ves. and B.* 138.   *Chaplin vs. Coop-*
*er, Ib.* 16.   *Vancouver vs. Bliss*, 11 *Ves.* 462.   1 *Mad. Ch.*
*Pr.* 195, 216, 217, 218.   1 *Newland's Pr.* 398.   *Simmonds*
*vs. Lord Kinnaird*, 4 *Ves.* 746.   *Seers vs. Hind*, 1 *Ves. Jr.*
293.   *King vs. Clark*, 3 *Paige*, 77.   *Winslow vs. Collins*,
3 *Paige*, 89.   *Ridgely vs. Gittings*, 2 *Harr. and Gill*, 58.
2 *Mad. Ch. Pr.* 577.   *Att'y Gen. vs. Butcher*, 4 *Russ.* 180.

7. That the decree, dismissing the bill as against *Richard*
*H. Clagett*, the minor, ought also to have declared the
mortgage void, and inoperative against him, and that the in-
junction should be subject to his rights.   2 *Harr. Ent.* 298.
*Giles vs. Barimore*, 5 *Johns. Ch. R.* 549.

8. The mortgage is inoperative as to the personalty, from
the failure to record it in time.   *Gassaway vs. Dorsey*, 4
*Harr. and McHen.* 405.   *Stat.* 13, *Ed.* 1.   2 *Inst.* 331.   2

*Harr. Ent.* 252. *Coke Lit.* 384. (*a*)   *Hurn vs. Soper,* 6 *H. and Johns.* 280 .*Belt vs. Hepburn,* 4 *H. and McHen.* 527.

*Taney,* (Att'y Genl. U. S.) *Johnson,* and *Mayer,* for the appellee.

If the question of costs is subject to the review of this court, which may be well doubted, there is nothing in the circumstances of this case which should except it from the general rule, allowing costs to the successful party. The defendants have contested the complainant's claim throughout, and subjected him to a great deal of unnecessary trouble and expense in establishing his claim. *Winder vs. Diffenderffer,* 3 *Gill and Johns.* 311. *Vancouver vs. Bliss,* 11 *Ves.* 462. *Newell vs. Trustees of Huntington,* 1 *Johns. Ch. R.* 182.

2. The mortgage was designed to guarantee the appellee against loss, and the words of the instrument are to be construed most strongly against the mortgagors. *Mason vs. Pritchard,* 12 *East.* 228. It has been said, that the mortgagors did not intend that *Salmon's* responsibilities for *Thomas Clagett* should exceed $10,000, and that by going beyond that amount they are discharged from liability. This however, cannot be the true construction of the mortgage, nor could such have been the design of the parties; unless we suppose they intended that *Thomas Clagett's* debts to every body should never, in the aggregate, exceed $10,000, for, with respect to the risk of the mortgagors, it is precisely the same, whether the money is due to *Salmon* alone, or to *Salmon* and others. But the authorities on this point are conclusive, and need only be referred to. *Lanusse vs. Barker,* 3 *Wheat,* 148, (*note.*)   *Sturges vs. Robbins,* 7 *Mass. Rep.* 301. *Kirby vs. Duke of Marlborough,* 2 *Maul. and Selw.* 18.

3. The failure to record the mortgage in time, is no objection to its validity as between these parties. The case in 4 *Harr. and McHen.* 405, only decides, that an *office copy* of a paper not recorded in time, is not evidence, and not that the *original* would not be binding upon the parties to it.

The acts of 1729, *ch.* 8, and 1763, *ch.* 13, are to be construed together.  The former embraced the cases of sales, gifts, and mortgages.  The latter only of gifts of negro slaves, and of course, gifts only are affected by it.  The objection, that the personal property was in the hands of *Elizabeth Clagett* as administratrix, and for that reason, that the mortgage is invalid, is equally destitute of foundation.  After such a lapse of time, the legal presumption is, that the debts of the deceased have been paid, as was decided in *Allender and Riston;* but if this was not so, still, as between the administrator and the grantee, the former cannot be allowed to impeach the deed, upon the ground that it was made in fraud of creditors.  Such an objection cannot be made by him. *Marshall vs. Williams,* 4 *Gill and Johns.* 376.  Nor can the distributees make the objection, because they also are parties to the deed.  The minor, *Richard,* does not in his answer rely upon his infancy as a defence.  He, like the other defendants, puts the complainant upon the proof of his claim, and relies upon the other defences set up by them.  If he had relied upon his infancy, and had asked that his share of the fund should be paid him, it might have been different; but as he has not done so, and seeks to vacate the whole deed, he cannot have his proportion paid him.  It is, therefore, the ordinary case of an administrator, and distributees, disposing of the estate of an intestate, which disposition is good unless impeached upon the ground of fraud, of which there is no evidence, nor is there any evidence that *Salmon* knew that *Richard* was a minor, or that there were other distributees besides those who executed the deed.  *Allender vs. Riston,* 2 *Gill and Johns.* 97.  7 *Johns. Ch. R.* 17.  But in point of fact, the minor is not prejudiced by the decree in this case.  The bill as to him is dismissed with *costs,* and when the fund gets into the court of Chancery the decree interposes no obstacle to his there seeking and recovering his share.  The object of this bill is simply to prevent the parties to the mortgage (as to whom it is unquestionably a valid instrument) from alienating the property, and the de-

cree only perpetuates the injunction for that purpose. It does not direct a sale, nor in any way affect the minor's interest.

The fourth and fifth points of the appellants assume the validity of the mortgage, and say, that at the time the bill was filed, the mortgagee might have foreclosed. This is not so; at the time the bill was filed the mortgagor was not in a condition to foreclose as to the real, or take possession of the personal estate. The agreement with *Cobb and Bidel* took from him this right. At the time the bill was filed, the appellee had no remedy at law, and if a court of Chancery could not interfere by way of injunction, the danger of loss to which the property was exposed could not be averted. The decree does nothing more than protect the appellee from fraud, and this court consequently cannot reverse it. It is said that there could not be a final decree or perpetual injunction. The answer to this is, that the case was to be finally disposed of in some way, so that the party entitled should recover his costs. But there is nothing in the decree which prevents the defendants from redeeming. They are not to await the proceedings of the opposite party. It has been urged, that the effect of a final decre in one case, cannot be altered or impaired upon a subsequent independent bill. Though this may possibly be true as a general rule, it cannot apply to a case like the present, where, from the very nature of the proceeding, a subsequent bill is indispensable. To show that the bill made a proper case for an injunction, they referred to *Jeremy's Eq.* 306. *Eden Inj.* 1. *Keyes vs. Brush,* 2 *Paige's Rep.* 311.

6. The agreement of the 26th May, 1828, between the appellee and the trustees of *Thomas Clagett,* does not release the sureties. The proviso in the mortgage is, that if *Thomas Clagett* should pay the sums for which the mortgage was to stand as a security, by the 1st of October, 1830, it should be void. The payment then, on or before that day, would save the mortgage, as to every description of liability or advance to be made by *Salmon.* It cannot be supposed

that the mortgagors intended that if *Salmon* should make an advance, or pay a note for *Clagett,* at any time before the 1st of October, 1830, that he should be at liberty at once, to foreclose for the amount so paid or advanced. The object of the parties at the time of the contract was, to give *Clagett* the advantage of *Salmon's* aid until the 1st of October, 1830, which would be defeated by a construction, authorizing him to proceed against the sureties earlier. If this be the true construction of the mortgage, then the agreement of May, 1828, does not enlarge the time, because, it leaves him at liberty to proceed in May, 1830. One of the stipulations of this agreement is, that the mortgage shall not be impaired by it. No construction, therefore, can be given to it which will have that effect, because that stipulation is as essential a part of the agreement as any other. If it cannot be so executed as to avoid that effect, it should not be executed at all. An agreement for time which will discharge a surety, must be an agreement to give time in the very contract supposed to be discharged, and must suspend the creditor's remedy on that account. *Planter's Bank vs. Selman,* 2 *Gill and Johns.* 230. But the agreement in this case did not suspend the remedy on the mortgage, and of course, it cannot be discharged. Nor does the agreement release *Clagett,* as has been urged. In the first place, it is not a technical release under seal; and in the second, it contains no words of present release, but only stipulates for his discharge, upon his doing certain things which he not only has not done, but is now resisting.

But suppose the agreement does give time, and release the principal debtor, cannot that be done with an effectual reservation of the creditor's remedy against the surety? If time be given, or the principal released without such reservation, the surety is discharged, because otherwise the debtor could not have the benefit of the release, as the surety, if made to pay the money, might immediately, notwithstanding the release, proceed against his principal. The latter therefore would be deceived, and tantalized with

hopes which could not be fulfilled. If however the debtor consents to the reservation, he can have nothing to complain of, nor is the surety injured, since his remedy over against his principal, is precisely as it was before the release, and he stands in all respects after, as he stood before. *Ex parte Gifford*, 6 *Ves.* 835. *Boultbee vs. Stubbs*, 18 *Ves.* 20. *Chitty on Bills*, 294. 1 *Saund. P. and Ev.* 309. 3 *Kent Com.* 112.

STEPHEN, J. delivered the opinion of the court.

The decision of this case involves the consideration of several important principles of equitable jurisprudence, relative to the doctrine of substitution, and the rights, duties, and obligations resulting from the relation of principal and surety. (And here the judge referred to the statement of the cause as set forth in the commencement of this report.)

The defendants appealed from this decree, and contended that it should be reversed, because the complainant has no equitable right or claim to any part of the personal property mentioned in the aforesaid mortgage, the said property being in the hands of the appellant, *Elizabeth*, as administratrix of *William Clagett*, deceased, and liable to the demands of the creditors, and next of kin of the deceased: They further contend, that by the terms of the mortgage, the appellee stipulated to limit his advances to *Thomas Clagett*, to the sum of $10,000, and by giving credit beyond that sum, he released the other appellants, who were only sureties. That those sureties are released by the agreement between the appellee and the trustees of *Thomas Clagett*, which was intended materially to vary the original contract for guarantee, and to impair, and destroy the remedies to which the sureties in the absence of the agreement would have been entitled. They also contend, that the appellee has failed to show by his bill or proofs, any ground for the interference of the court of Chancery by injunction; and that the court of Chancery erred in decreeing a perpetual injunction, and declaring such injunction to be subject to

any order to be passed in another cause. And that costs ought not to have been decreed to the appellee. They finally contend, that the decree dismissing the bill as against *Richard H. Clagett,* ought also to have declared, that the aforesaid mortgage is void, and inoperative against him, and that the injunction should be subject to his rights.

As to the first objection raised by the appellants, that the deed of mortgage conveyed no right or title to the personal property therein specified; it may be remarked, that the deed only professes to convey all their right and title to the property, which of course was subject to the claims of creditors, if any such there were, but from the lapse of time which had taken place between the death of *William Clagett,* and the date of the letters of administration granted to his widow, *Elizabeth Clagett,* and the date of the mortgage, it is fair to presume that the debts were all paid and satisfied prior to that time, and consequently that the mortgage did not in any degree operate to their prejudice. It appears by the proof in the cause, that an inventory of his estate was returned in the year 1816, and that his administratrix settled with the Orphans Court an account which she termed a final account in the year 1823. The deed of mortgage was not executed till the year 1827. It appears then, that a period of about eleven years had expired from the time letters of administration were taken out upon his estate before the mortgage was executed; and this court have said in the case of *Allender vs. Riston,* 2 *Gill and Johns.* 99, "in the case now before this court it no where appears that there were any debts remaining due and unpaid at the time of the mortgage; or if there were, that the defendants knew of them;" and to use the language of Mr. *Justice Ashhurst,* in 4 *Term. Rep.* 645; "if the creditors will lie by and not assert their rights, it is reasonable for a third person to suppose that all the debts are satisfied." In the case now before this court, the presumption of payment arising from lapse of time is strongly fortified and corroborated by the fact, that the administratrix passed her

final account with the Orphans Court, several years prior to the execution of the deed of mortgage.

In the case above referred to, this court held the following language, which is strikingly applicable to the case under consideration. " It does not appear that the administratrix acted in her representative character at the time she executed the deed of mortgage. She does not in terms assume that character, and has associated herself in making the disposition of the property with three of the children, and representatives of her intestate. From this fact, connected with the strong circumstances existing in the case to induce a presumption that the debts were all satisfied, it is fair to infer, that she had made a distribution of the remaining assets, and acted in her character of distributee." But it is contended on the part of the appellants in this case, that the bill of the complainant shows that no distribution was ever made prior to the execution of the deed of mortgage in this cause; but so far from this being the fact, upon recurring to the bill it will be found that it expressly charges that distribution was made by the Orphans Court, but that the property never had been actually delivered to the representatives, but remained in the possession of the administratrix, and *Edmund Clagett,* one of the distributees, who used and employed the same for the common benefit of themselves, and the other heirs and legal representatives. If this view of the case be correct, and there was sufficient ground to infer that the debts were all paid and satisfied, the next question which arises is, whether or not the deed is binding and obligatory on the mortgagors who executed it; and the question as to the power or right of an executor to appropriate the assets of the deceased, in any manner not conformable to the duties of his trust, is not necessarily involved in the consideration of this case. We do not consider that the act of 1763 has any operation or bearing upon the merits of this controversy, as it relates wholly to gifts of negroes and slaves, and has nothing to do with mortgages or other assurances for valuable considera-

tion. By the provisions of the act of 1729, *ch.* 8, a mortgage of personal property, of which the mortgagor retained posses-sion is void, unless acknowledged and recorded as therein prescribed, so far as the rights of creditors are concerned; but although not recorded at all, or not recorded in time, it is still legally operative and effectual against the mortga-gor, and all claiming under him. This court have accor-dingly in *Dorsey vs. Smithson*, 6 *Harr. and Johns.* 63, decided, that a deed not recorded as the act of Assembly directs, is void as to creditors if made to their injury, but it is binding on the donor, and all claiming under him, both at common law, and under said act. This case also shows that the deed being binding and obligatory on the parties there-to, they are estopped to allege that the same is in fraud of creditors. In *Hudson vs. Warner and Vance*, 2 *Harr. and Gill*, 427, this court sanction the same principle, and held the following language in reference to the case then before them. " The bill of sale made in 1820 to *Warner and Vance* was made upon a good consideration. It was made to indemnify them against suretyships entered into, and to be entered into by them for *J. and T. Vance*, and it cannot be questioned but that it was perfectly available, as between the immediate parties to the instrument, although it was not recorded. It might be void against creditors who were injured by it, yet nevertheless binding on them." We are therefore of opinion, that the deed of mortgage was legally binding, and obligatory upon all the parties who were of full age at the time it was executed.

As to the objection that the sureties are discharged, be-cause *Salmon* did not limit his advances to the sum of $10,000, we think that no such result legitimately flows from the contract, according to its true and proper construc-tion. The same objection was made and overruled in a case strikingly analogous, reported in *Sturges et al. vs. Robbins*, 7 *Mass. Rep.* 301, 304. That case was as fol-lows : "A subscribed a memorandum of the following tenor, viz: the subscriber hereby engages to Messrs. B

and C, that if they will credit D, a sum not exceeding $500, in case he shall not pay the same in twelve months from this date, I will pay the same myself. In consequence whereof, B and C sold goods to D, to the value of $500, taking his promissory note for that sum. Immediately after B and C sold D other goods, for which he gave another note for $375. Within the year D paid $200, which was endorsed on the last mentioned note, and in three months after the year expired, he paid the balance of that note, and it was cancelled. Soon afterwards B and C sold other goods to D, taking his promissory note for $379 for the same, without any guarantee; $200 were paid on this last note, the balance thereof, and the whole of the note for $500 remaining unpaid. In an action by B and C against A, upon the memorandum aforesaid, it was held, that A was answerable for the $500 and interest, from the expiration of the year; due notice having been given him, that the debt which he had guarantied was unpaid, and the same having been demanded of him.—Parker, J.—on the facts agreed in the case; the question submitted to us is, whether the defendant is liable for the whole, or any part of the sum mentioned in the writing on which the action is founded. The counsel for the defendant has contended, that the writing signed by the defendant contained a conditional engagement only, and that the condition is of a nature to avoid the contract, if not strictly complied with by the plaintiffs, the true construction of the writing being, that the defendant would be answerable, if the plaintiffs did not trust Davis more than $500, but that if they exceeded that sum, he was not to be liable. We cannot adopt this construction, being satisfied, that the words which are supposed to amount to a condition, were intended by the defendant, only to limit his responsibility to the sum of $500 ; there being no reason why he should be unwilling that Davis should obtain further credit on his own responsibility, a circumstance which would diminish, rather than increase the defendant's eventual liability to pay the money."

We think, under the allegations contained in the bill, and the circumstances of this case, the chancellor did right in granting the injunction, for the purpose of holding the property responsible for the satisfaction of the mortgage. The language of the complainant's bill is, "that he has reason to believe, and therefore charges, that the defendants contemplate and design to sell and dispose of part or the whole of said property, with a view of defeating your orator's lien, and that he is apprehensive, the defendants will sell, dispose of, conceal or remove the whole, or a part of the personal property, before the same can be made responsible to him, for the satisfaction of his claim." In the case of personal property, held by one for life, remainder to another, where danger of loss, or injury is apprehended. *Chancellor Kent,* in 2 *Com.* 286, 287, speaks in the following terms. "The interest of the party in remainder in chattels, is precarious, because another has an interest in possession, and chattels by their very nature, are exposed to abuse, loss, and destruction. It was understood to be the old rule in Chancery, that the person entitled in remainder, could call for security from the tenant for life, that the property should be forth-coming at his decease; but that practice has been overruled. *Ld. Thurlow* said, that the party entitled in remainder, could call for the exhibition of an inventory of the property, and which must be signed by the legatee for life, and deposited in court, and that is all he is ordinarily entitled to. But it is admitted, that the security may still be required in a case of real danger, that the property may be wasted, secreted, or removed." To the same effect is 2 *Fearne* on *Remainders,* 35, where he says, "we may recollect its having been said, that in case of a bequest of goods, to one for life, with remainder over, the legatee for life was compellable in equity, to give security for the goods being forth-coming at his decease, and accordingly, in the above cited cases of *Vachel vs. Vachel,* and *Hyde vs. Parratt,* the bills appear to have prayed such security, and this it seems was the old rule of

the court. But the latter practice is, for an inventory to be signed by the devisee for life, and to be deposited with the master for the benefit of all the parties, which *Ld. Thurlow,* in a late case observed, was more equal justice, as there ought to be danger in order to require security."

As establishing the same principle, we have the following ing case in 4 *Hen. and Mun.* 503. "The defendants had re-covered a judgment at law, against the plaintiff for some ne-groes, the use of whom was devised to the defendant's wife for life, and then to the plaintiff, and the bill was filed for an in-junction, which was granted, to inhibit the defendants from getting possession of the negroes until they gave security for their forth-coming at the death of the wife, upon this ground, that her husband having failed as a merchant, might put the negroes beyond the plaintiff's control. Upon the coming in of the answer, although it denied that allegation, and of which there was no proof, the court refused to dissolve the injunction, as both parties had become interested in the con-tinuance thereof; and directed an account of the profits since the verdict, which account was reported, and the cause now came up for a final hearing. By the chancellor, though it is a matter of course for one in remainder of chattels, to file a bill for an account, and an inventory of the property, that it may be certainly known; yet, the court will not rule the tenant for life to give security, un-less there appears to be some danger of wasting, or putting the property out of the way. In this case, that danger does not appear. The report however, which contains an ac-count of the property, may be confirmed as a beneficial one to both sides, since the plaintiff was properly admitted into court." The principles recognized in these cases fully justify the granting of the injunction to preserve the pro-perty, and prevent it from being removed before it could be made responsible to the complainant's claim, according to the terms of the contract entered into between the parties. The only effect and operation of it, was to put it out of the power of the respondents, to commit an act of fraud and in-

justice, of which they must complain with very ill grace in a court of conscience.

Neither do we think that the chancellor erred in decreeing costs to the appellee, even if an appeal would lie for costs. In *Eastburn and Downes vs. Kirk,* 2 *Johns. Ch. Rep.* 318, *Chancellor Kent* says, "costs in chancery do not depend upon any statute, nor do they absolutely depend upon the event of a cause. They depend upon conscience and upon a full and satisfactory view and determination of the whole merits of a case. They rest in sound discretion, to be exercised under a consideration of all the circumstances. A litigation for costs only, is never favored in a court of equity. A party cannot have a re-hearing for costs only, except in special cases, and it is understood that an appeal will not lie merely for costs. *Selw. Wyatt, Prac. Reg.* 34, says, "a party cannot appeal for costs only, but in particular cases the rule may, and has been dispensed with. He then adds a *quere,* whether it can be dispensed with, only in cases, where it appears on the face of the decree, that costs are improperly given, or where the merits must be gone into?" So in *Doe ex dem. vs. Winch et al.* 5 *Barn. and Ald.* 393. ABBOTT, Ch. J., says, "the costs at law, are the legal consequences of the suit. The costs in chancery, are in the discretion of the chancellor, and entirely depend upon circumstances." *Without in-*. tending to decide whether an appeal will lie on account of costs or not, we do not think that the circumstances of this case would warrant an exception to the general rule. If the general rule be as above stated, that a party cannot appeal for costs only, it sufficiently appearing from the pleadings and facts of the case, that the party complainant had good grounds, and was well warranted in applying to the Court of Chancery for its aid and assistance in preserving the property until it could be applied to his indemnity, and consequently that costs were properly awarded to him. With respect to the effect of the agreement between *Thos. Clagett,* the trustees of *Thomas Clagett* and the appellee, and

how far it operates to discharge his sureties, it may be remark-
ed that though the rule of law is well known to be, that if
two persons be bound jointly and severally, and the obligee
releases one of them, both are discharged, yet, equity will
not give a release an operation beyond the intention of the
parties, and the justice of the case. The release is to be
construed according to the intent and object of it, and that
intent will control and limit its operation. *Fonb. Eq.* 511.
So in 6 *Johns. Ch. Rep.* 242, the principle was adjudged to
be, that "where two or more persons are jointly, and sever-
ally bound in one obligation, a release of one obligor entire-
ly discharges the rest at law, but not strictly so in equity.
For equity will not extend the operation of a release be-
yond the clear intention of the parties, and the justice of
the case, but will construe it to relate to the particular mat-
ter intended to be released. Thus, where A, B, and C,
guardians, executed a bond, jointly and severally with T,
as their surety, for the faithful performance of their guar-
dianship, and the ward, after coming at full age, executed
a release to A, adding, "but this release is not to apply to,
or affect my claim against B, my acting guardian, and whose
account remains unsettled," Held, that the release as to
A was good, and was also a good defence to T, so far as he
was surety for A; but that he remained bound for B and
C, the other two obligors."

It is true, that where time is given by contract, to the
principal for the payment of the debt, without the consent
of the surety, he will be discharged, because he is only
bound by the terms of his contract, and any variation of
those terms without his consent, will operate to discharge
him. Thus, in *King vs. Baldwin,* 2 *Johns. Ch. Rep.* 559,
*Chancellor Kent* says, "all the cases of relief of surety
have gone upon the ground, that time was given to the
principal by contract, without consent of the surety. The
doctrine is, that the surety is bound by the terms of his
contract; and if the creditor, by agreement with the prin-
cipal debtor, without the concurrence of the surety, va-

ries those terms by enlarging the time of performance, the surety is discharged, for he is injured, and his risk is increased.   The surety is entitled to pay the debt when it becomes due, or he may call upon the creditor by the aid of this court, to enforce his demand against the principal debtor.   On paying the debt, he is entitled to the creditor's place by substitution, and if the creditor by agreement with the principal debtor, without the surety's consent, has disabled himself from suing, when he would otherwise have been entitled to sue under the original contract, or has deprived the surety, on his paying the debt, from having immediate recourse to his principal, the contract is varied to his prejudice, and he is consequently discharged.   This is the true principle to be extracted from the cases."   It is then upon the principle, that the contract of the surety is changed, or varied to his prejudice, and without his consent, that the surety is discharged.   It is because the creditor has disabled himself from fulfilling the duties and obligations which he owes to the surety, that he is released from his responsibility.   By giving time to the principal debtor, he disables himself from suing him so soon as the debt becomes due, when called on by the surety, through the intervention of the court of equity to do so.   By extending the time of payment, he moreover deprives the surety of the benefit of substitution, according to the original terms of the contract ; because upon paying the debt, the surety would have been clothed or invested with the creditor's rights against the principal debtor ; and but for the change of contract, would have been entitled to have immediate recourse to him for reimbursement and indemnity.

In the agreement entered into between *Salmon, Clagett,* and his trustees in this case, we find the following stipulation.   " It is expressly understood, that nothing contained in this agreement shall in any manner affect the mortgage heretofore given by *Thomas Clagett* and his family, to indemnify said *Salmon* against certain risks or losses, except-

ing so far as to delay foreclosing the said mortgage from two years from the date hereof." The said agreement also contained the following stipulation. "After this agreement has been executed by the respective parties to it, it is understood, that all responsibilities to and from *Thomas Clagett* shall be annulled, so far as the persons we severally represent be concerned. Also to exonerate the family of *Thomas Clagett* from the payment of such notes as may be signed or endorsed by them, and held by said *Salmon*, not interfering with, or invalidating their liability in the mortgage held by said *Salmon*." Here then, we find an express reservation by *Salmon* of all his rights under the deed of mortgage, and an express contract, that the liability of the sureties of *Thomas Clagett* should not be in any degree lessened or impaired by the terms of said agreement. What is the legal effect and operation of such a reservation upon the relative rights of *Salmon*, and the sureties of *Clagett*, and how far they are absolved from all responsibility to *Salmon*, in virtue of said agreement, remains now to be considered?

In *Boultbee vs. Stubbs*, 18 *Ves.* 26, the *Ld. Chancellor*, after stating the general principle, that if time is given to the principal the surety is discharged, holds the following language. "The objection to the reserve of remedy against the surety consists, in the interest the principal has, that the surety shall not be applied to. It is said, that the principal cannot by contract deprive himself of the benefit derived from that forbearance; and there certainly have been decisions, that if time is given to the principal reserving the right to go against the surety, the principal cannot raise the objection upon his right to time, as against the surety, as there is the contract of the principal arising out of the contract for reserve against the surety, that the latter, if the creditor goes against him, shall not be deprived of the benefit of the contract as against the principal. That was *Burke's* case. If the contract for reserve against the surety prevents his remedy

against the principal, that contract for reserve will not do. But the question is, whether it does in law deprive the surety of that benefit. It may in many cases be a very rational provision that the principal shall have time, provided he can have it without prejudice to the benefit of the remedy against the surety; which, though worth nothing at present, may in a year's time be very valuable, and the creditor may very reasonably mean to secure the benefit of that contingency." So also, it is said in *Chitty on Bills,* 203, that a composition with the acceptor, or other party to a bill, reserving the remedy for the remainder against the other parties, has been recognized in courts of law and equity, as not discharging such other parties. And in 1 *Saund. Pl. and Ev.* 378, the same principle is stated, where he says a composition with the acceptor, or other party to a bill, reserving the remedy for the remainder against the other parties, will not discharge such other parties. There are two grounds upon which a creditor is held to discharge the surety by giving time to the principal. "According to one, the creditor by agreeing to give time, is regarded as having disentitled himself to proceed against the debtor, until the time agreed to be given is expired. But an agreement which has such an effect, is inconsistent with the obligation of the creditor to sue the principal debtor at any moment when called upon to do so by the surety; as the creditor's voluntary disablement of himself for the performance of this, or of any obligation which he is under towards the surety, discharges the surety. According to the other, he is regarded as having in point of good faith towards the debtor, obliged himself not to proceed against the surety; because, supposing him to proceed against the surety, and the surety to pay, the surety would be entitled instantly to proceed against the debtor; and so, through the medium of the surety, he would deprive the debtor of the time which he agreed to give him; and therefore, to preserve good faith, he shall not proceed against the surety." 1 *Law Library,* 107. So also, "the

surety who has paid the debt of his principal, is entitled to stand in the place of the creditor, as to all securities for the debt held or acquired by the creditor, and to have the same benefit from them as the creditor." *Ib.* 150. But if the creditor reserves his remedy against the sureties, in the contract he makes with the principal debtor, the debtor thereby tacitly consents to forego, or waive the benefit of such contract, in case the creditor should afterwards find it necessary to resort to the sureties for the full and complete extinguishment of his debt. The contract therefore between the creditor and principal debtor, is not absolute, but conditional and contingent. In the case before this court, *Salmon* had taken an assignment of property, for the satisfaction of his claim against *Clagett.* He did not know at the time, to what extent it might be available for that purpose; and therefore his object evidently was, not to lose the benefit of the surety he had obtained for its payment, by the arrangement he made with *Clagett* and his trustees. After stating that *Clagett* should be discharged, and his family released from certain notes signed and endorsed by them, upon the execution or fulfilment of the agreement entered into between the parties, such release, not to interfere with, or invalidate their liability in the mortgage held by *Salmon,* the parties to the contract insert the following stipulations. " It is expressly understood, that nothing contained in this agreement shall in any manner affect the mortgage heretofore given by *Thomas Clagett* and his family, to indemnify said *Salmon* against certain risks or losses, excepting so far as to delay foreclosing said mortgage for two years from the date hereof." Here then, we find an express contract on the part of *Thomas Clagett,* that notwithstanding this agreement for his discharge, the remedy of *Salmon* upon the mortgage, should not in the slightest manner be affected by it, but that his rights should remain the same as they were before such agreement, with the exception only of the delay of foreclosure, as therein stated. This reservation of his rights to

proceed against the sureties, contained in the same instrument stipulating for the discharge of the principal, amounted to an agreement on the part of the principal, to waive the benefit of that discharge, and to hold himself responsible to his sureties, in case *Salmon* should find it necessary to resort to them for payment or indemnity. As therefore in such an event, their rights and remedies against *Clagett* remained wholly unimpaired and unaffected, we do not perceive that they have any cause to complain, or that there is any ground, either in law, justice or reason, upon which they can claim to be discharged. By coercing payment from the sureties under this express agreement, no fraud would be practiced upon the principal, or injustice done to him, in case they should resort to him for reimbursement or indemnity; because the assent of the principal to continue liable to them, was implied in the reservation of the rights of the creditor to proceed against the sureties.

We do not think that there is any error in the chancellor's decree, so far as the interest of *Richard H. Clagett* was concerned. As to him the injunction was dissolved, and the bill dismissed with costs. Farther than this, we do not think the chancellor was bound to go, so far as his interest was involved in the controversy. Nor do we think that the decree passed by the chancellor in this case, was improper or objectionable. It merely provided for the security of the mortgaged property, until it was made to answer the purposes for which it was pledged under the deed of mortgage, and was well adapted to the exigency and justice of the case. In *Wyatt's Practical Register in Chancery*, p. 154, he says, "A decree is a final sentence or order of court, determining the rights of matters in question, *according to* equity, and ordering the parties accordingly, pronounced on hearing and understanding the cause."

Thinking the decree in this case perfectly conformable to the substantial principles of equity, and well adapted to secure the purposes of justice, we think the same ought to be affirmed.

DECREE AFFIRMED WITH COSTS.